**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Karen Anderson, | ) | |
| | ) | **ORDER GRANTING IN PART AND** |
| Plaintiff, | ) | **DENYING IN PART DEFENDANT'S** |
| | ) | **MOTION IN LIMINE AND DENYING** |
| vs. | ) | **DEFENDANT'S MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| | ) | |
| | ) | |
| Hess Corporation, | ) | |
| a Delaware Corporation, | ) | Case No. 1:07-cv-065 |
| | ) | |
| Defendant. | ) | |

Before the Court are the Defendant's Motion in Limine and Motion for Summary Judgment filed on December 5, 2008. See Docket Nos. 11 and 14. The Plaintiff filed a brief in opposition to the motions on December 22, 2008, and a reply brief on December 31, 2008. See Docket Nos. 19, 24. Oral arguments on the motion were held on January 9, 2009. For the reasons set forth below, the Defendant's motion in limine is granted in part and denied in part, and the motion for summary judgment is denied.

**I.     BACKGROUND**

Around midnight on June 20, 2006, the plaintiff, Karen Anderson, went to bed with her bedroom window open. She awoke around 4:30 a.m. gasping for air and had the sensation that the bed was spinning. Anderson got out of bed and went to the window to get some air. She next remembers lying on the bathroom floor trying to lift her head up because she felt sick. See Docket No. 12-2, pp. 14-15. Bob Anderson, Karen's husband, had fallen asleep while watching television and awoke when he "heard something." See Docket No. 12-3, p. 22. He found Karen Anderson

lying on the bathroom floor. She told Bob Anderson that she felt nauseous and that "I feel like I've been eating metal." See Docket No. 12-3, p. 23. Bob Anderson walked into the bedroom and detected a "gassy" smell that he believed originated from the Silurian Battery, which is a gas plant located approximately one and three-quarters miles from the Anderson residence near Tioga, North Dakota. See Docket No. 12-3, pp. 18, 24. The Silurian Battery is operated by the defendant, the Hess Corporation.

Bob Anderson drove his wife to the emergency room at the Tioga Medical Center. En route to the hospital, Bob Anderson noticed that a "gas cloud" appeared to encompass the air. See Docket No. 12-3, p. 33. As a result, Anderson contacted his employer, Hess Corporation, to report the gas emissions.

Karen Anderson was admitted to the emergency room at the Tioga Medical Center at 6:00 a.m on June 20, 2006, and was admitted to the hospital later that morning. Karen Anderson complained of exposure to hydrocarbon, dizziness, numbness in her hands and feet, and a metallic taste in her mouth. Dr. Mukesh Patel described Karen's history of present illness as follows: "She [Karen] states that she was sleeping in her bedroom and the bedroom window was open and a nearby incinerator was burning. The wind was in the direction of the window and she states she got gas from the window into the house." See Docket No. 12-5, p. 8. Karen Anderson was discharged from the Tioga Medical Center on June 20, 2006.

On June 22, 2006, Dale Weathersby, an environmental health specialist for the Silurian Battery, investigated gas emissions near the Anderson residence by using gas monitors. He detected no positive readings in the area between the Silurian Battery and the Anderson residence. However, Dale Weathersby observed a farmer in the vicinity of the Anderson property pulling a sprayer.

2

Weathersby researched the chemicals that farmers in the area use to spray weeds and determined that such chemicals are respiratory irritants.

Following Karen Anderson's admission to the Tioga Medical Center on June 20, 2006, she received follow-up medical care for her initial complaints of difficulty breathing. On June 27, 2006, Anderson was seen by Dr. H. K. Manne for shortness of breath. The dictation for the June 27, 2006, visit indicates:

> The patient states that there is a well close to her home about 1 to 1½ mile, which burns off excess gasses and that day they had some problems and she was exposed to significant concentrations of hydrocarbon gas in the air while she was sleeping in her bedroom. She had some difficulty with breathing, felt sweaty, and dizzy. Since that time the patient states that she has been feeling some shortness of breath.

See Docket No. 12-6. On a referral from Dr. Manne, Karen Anderson was first seen by Dr. Pedro G. Mendoza on July 7, 2006. Dr. Mendoza is a pulmonologist in Bismarck, North Dakota. Dr. Mendoza stated the reason for the referral as follows:

> She is being seen for an acute exposure on June 20, 2006, to gas that is causing pressure on the chest and shortness of breath with coughing. On that date, she had to go to the emergency room. She was seen by Dr. Mukesh Patel after an exposure of carbons that consisted of $SO_2$ and hydrogen sulfide. The source of the gases was a mile to a mile and a half from their home, and she had an acute exposure around 4:30 in the morning, going to bed at 12:30. Ever since she has had coughing spells and a burning sensation in the throat and in the right upper lobe.

See Docket No. 12-7. Dr. Mendoza's impression was that Karen Anderson did not have the symptomatology prior to June 20, 2006. Under the care of Dr. Mendoza, Anderson underwent a methacholine challenge test and a CT scan of the chest. Following the results of those tests, Dr. Mendoza diagnosed Anderson with Reactive Airways Dysfunction Syndrome (RADS). Anderson was seen again by Dr. Mendoza in December of 2006 and April of 2007 for pulmonary follow-ups.

On September 4, 2007, Karen Anderson was self-referred to Dr. Nicholas H. Neumann for asthma. Dr. Neumann is also a pulmonologist who practices in Bismarck, North Dakota. Dr. Neumann diagnosed Anderson with RADS secondary to hydrogen sulfide exposure in June of 2006. Anderson was seen by Dr. Neumann in December of 2007, and June of 2008 for continued RADS treatment.

Karen Anderson filed a lawsuit in federal district court alleging that the defendant, Hess Corporation, was negligent by failing to properly operate and maintain the Silurian Battery, by allowing $H_2S$ gas and/or other toxic gases to be emitted from the tank battery, by failing to have and/or implement an appropriate emergency plan, and by failing to warn local residents of the release of toxic gases. See Docket No. 1. Hess Corporation filed an answer in which it admits that it operates a tank battery near the Anderson residence and that on June 20, 2006, gases were emitted from the Silurian Battery. See Docket No. 4. Hess Corporation expressly denies that the emission of the gases caused any injury to Karen Anderson. See Docket No. 4.

Hess Corporation has filed a motion in limine to suppress any causation testimony by Karen Anderson's medical experts, Dr. Mendoza, Dr. Neumann, Gail Joyce, PA-C, Corinne Coughlin, PA-C, and Tonya Anderson, FNP-C. Hess Corporation contends that none of these medical experts performed tests to determine the cause of Anderson's respiratory condition, nor did any of the witnesses investigate other possible causes to make a differential diagnosis.

## II.  ADMISSIBILITY OF EXPERT OPINION TESTIMONY

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence. Under Rule 702, the trial judge acts as a "gatekeeper" to screen expert testimony for

relevance and reliability. Daubert v. Merrell Dow Pharmaceuticals Inc., 509 U.S. 579, 591-93 (1993). "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony. The rule clearly is one of admissibility rather than exclusion." Polski v. Quigley Corp., 538 F.3d 836, 839 (8th Cir. 2008) (quoting Lauzon v. Senco Products, Inc., 270 F.3d 681, 686 (8th Cir. 2001)). "The exclusion of an expert's opinion is proper only if it is so fundamentally unsupported that it can offer no assistance to the jury." See id. (quoting Wood v. Minnesota Mining & Mfg. Co., 112 F.3d 306, 309 (8th Cir. 1997)).

Under Rule 702, expert witness testimony regarding "scientific, technical, or other specialized knowledge" is admissible if it will "assist the trier of fact to understand the evidence or to determine a fact in issue." A qualified expert may testify thereto if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.

The Eighth Circuit Court of Appeals has explained the three prerequisites of admissibility under Rule 702 as follows:

> First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be qualified to assist the finder of fact. Third, "the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires . . . ."

Lauzon, 270 F.3d at 686 (quoting 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 702.02[3] (2001)). "Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested. 'Scientific methodology today is based on generating hypotheses and

5

testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry.'" Daubert, 509 U.S. at 593.

In Daubert, 509 U.S. at 588-89, the United States Supreme Court determined that the "general acceptance" standard articulated in Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), was inconsistent with Rule 702. "Nothing in the text of this Rule establishes 'general acceptance' as an absolute prerequisite to admissibility. . . . The drafting history makes no mention of Frye, and a rigid 'general acceptance' requirement would be at odds with the 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to 'opinion' testimony.'" Daubert, 509 U.S. at 588. Instead, Rule 702 requires that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." Id. at 589. The principles set forth in Daubert apply to all expert witness testimony. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999) ("We conclude that Daubert's general holding – setting forth the trial judge's general 'gatekeeping' obligation – applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."); accord Jaurequi v. Carter Mfg. Co., 173 F.3d 1076, 1082 (8th Cir. 1999).

**III.    TOXIC TORT CASES**

It is alleged in the complaint that on June 20, 2006, Hess Corporation operated the Silurian Battery near her home and that toxic gases were emitted from the tank battery causing serious injury to her. The claims which Karen Anderson alleges are grounded in toxic tort. Hess Corporation moves to exclude the causation testimony of Anderson's medical expert witnesses under Rule 702 and Daubert.

"To prove causation in a toxic tort case, a plaintiff must show both that the alleged toxin is capable of causing injuries like that suffered by the plaintiff in human beings subjected to the same level of exposure as the plaintiff, and that the toxin was the cause of the plaintiff's injury. In other words, the plaintiff must put forth sufficient evidence for a jury to conclude that the product was capable of causing her injuries, and that it did." Bonner v. ISP Technologies, Inc., 259 F.3d 924, 928 (8th Cir. 2001) (internal citations omitted). However, a plaintiff is not required to produce a mathematically precise table equating levels of exposure with levels of harm – the plaintiff must only produce evidence from which a reasonable person could conclude that the defendant's emissions probably caused the plaintiff's harms. Wright v. Willamette Indus., Inc., 91 F.3d 1105, 1107 (8th Cir. 1996).

"Daubert ensures that all expert testimony is scientifically reliable before being submitted to the jury." Turner v. Iowa Fire Equip. Co., 229 F.3d 1202, 1207 (8th Cir. 2000). Neither Rule 702 nor Daubert requires the expert testimony to resolve the ultimate issue of fact to a scientific absolute. Bonner, 259 F.3d at 929. "The only question relevant to the admissibility of the scientific evidence is whether it is sufficiently reliable and relevant to assist the jury's determination of a disputed issue." Id. "A treating physician's expert opinion on causation is subject to the same standards of scientific reliability that govern the expert opinions of physicians hired solely for purposes of litigation." Turner, 229 F.3d at 1207.

The Eighth Circuit Court of Appeals has stated that "a medical opinion about causation, based upon a proper differential diagnosis, is sufficiently reliable to satisfy Daubert." Id. at 1208. In Turner, the plaintiff alleged that she was exposed to a toxic chemical substance and sought to introduce testimony from her treating physician as to the medical cause of her symptoms. The

7

plaintiff's medical expert acknowledged that the differential diagnosis he performed was for the purpose of identifying the plaintiff's <u>condition</u>, not its <u>cause</u>. The expert "made no attempt to consider all the possible causes, or to exclude each potential cause until only one remained, or to consider which of two or more non-excludable causes was the more likely to have caused the condition." <u>Turner</u>, 229 F.3d at 1208. The Eighth Circuit specifically noted the difference between a medical physician performing a differential diagnosis and a causal diagnosis:

> As her treating physician, Dr. Hof wanted to identify Delores Turners' condition so he could treat it. Dr. Hof's diagnosis was, we believe, one which the medical community more properly identifies as "differential," <u>see</u>, <u>e.g.</u>, Stedman's Medical Dictionary 474 (26th ed. 1995) (identifying differential diagnosis as a systematic comparison of symptoms to determine which of two or more *conditions* is the one from which a patient is suffering), rather than the type of *causal* diagnosis which the legal community calls "differential," <u>see e.g.</u>, <u>Westberry v. Gislaved Gummi AB</u>, 178 F.3d 257, 262 (4th Cir. 1999) (identifying differential diagnosis as a technique that identifies the cause of a medical condition by eliminating the likely causes until the most probable cause is isolated).
>
> Unlike his diagnosis of condition, Dr. Hof's causation opinion was not based upon a methodology that had been tested, subjected to peer review, and generally accepted in the medical community. Significantly, Dr. Hof did not systematically rule out all other possible causes. He was clearly more concerned with identifying and treating Delores's condition than he was with identifying the specific substance that caused her condition.

<u>Id.</u>

The plaintiff in <u>Turner</u> relied on a Poisondex reference to show the causal link between the chemical agent and respiratory disease, but Dr. Hof did not rely on Poisondex in formulating his opinion. Further, the Eighth Circuit determined that the Poisondex reference, which merely stated that the chemical substance was a respiratory irritant, was insufficient to establish a causal link to the plaintiff's medical condition. However, "[i]f a properly qualified medical expert performs a reliable differential diagnosis through which, to a reasonable degree of medical certainty, all other

8

possible causes of the victims' condition can be eliminated, leaving only the toxic substance as the cause, a causation opinion based on that differential diagnosis should be admitted." Id. at 1209. Because Dr. Hof did not scientifically rule out all other possible causes of the plaintiff's condition, the Eighth Circuit upheld the district court's decision to exclude Dr. Hof's opinion as to the cause of her medical condition.

In Mattis v. Carlon Elec. Products, 295 F.3d 856 (8th Cir. 2002), the Eighth Circuit Court of Appeals determined that the district court properly admitted causation testimony by a medical expert in a toxic tort case. In Mattis, the plaintiff alleged that the inhalation of cement while working as an electrician caused RADS, and introduced expert testimony by his treating physician and an industrial hygienist regarding causation. The Eighth Circuit determined that the plaintiff's treating physician's testimony was legally sufficient because the physician performed a valid differential diagnosis to determine that plaintiff's exposure to the cement caused RADS.

> While treating Mattis, Dr. Hansen ruled out other possible causes of Mattis's illness, such as smoking, asthma, or ammonia, and concluded that he developed RADS as a result of his exposure to Carlon cement fumes. She also relied on published studies linking RADS to organic solvents like those in Carlon cement. This testimony was properly admitted at trial and by relying on it, a reasonable jury could find that exposure to Carlon cement was the cause of Mattis's injury.

Id. at 861.

In a recent toxic tort case, Bland v. Verizon Wireless, (VAW) L.L.C., 538 F.3d 893 (8th Cir. 2008), the Eighth Circuit Court of Appeals considered whether the district court properly excluded expert testimony on causation. In Bland, the plaintiff accidently left her water bottle in a Verizon Wireless store and an employee sprayed compressed air in the bottle as a joke. The plaintiff retrieved the water bottle and inhaled freon fumes as she attempted to drink from the bottle. The plaintiff experienced coughing, a sore sensation in her throat, a raspy sensation in her lungs, and a

9

headache. The plaintiff sought to introduce at trial causation testimony of her treating physician that freon caused her exercise-induced asthma. The district court excluded the treating physician's causation testimony, and the Eighth Circuit affirmed. The Eighth Circuit determined that the treating physician lacked any information as to (1) the amount of freon exposure that results in a harmful effect or even <u>if</u> exposure to freon causes exercise-induced asthma; and (2) the amount of Freon to which the plaintiff was likely exposed.

> "Critical to a determination of causation is characterizing exposure." "The magnitude or concentration of an exposure should be estimated" and "[t]he temporal aspects of the exposure should be determined – whether the exposure was short-term and lasting a few minutes, days, weeks, or months, or was long-term and lasted for years." Dr. Spince lacked knowledge regarding what level of exposure to Freon constitutes an appreciable risk of causing asthma and the specific concentration and degree of Bland's exposure to the freon. Without knowledge of these data points, Dr. Spince could not extrapolate from the existing data because, as the district court reasoned, the gap between the data identified and Dr. Spince's proffered opinion was "'simply too great an analytical gap' . . . to support admissibility."
>
> . . .
>
> The only remaining basis for Dr. Spince's causation opinion is temporal proximity, that is, Bland's inhalation or ingestion of the contents of the water bottle occurred shortly before Bland was diagnosed with exercise-induced asthma. "In the absence of an established scientific connection between exposure and illness, or compelling circumstances . . . the temporal connection between exposure to chemicals and an onset of symptoms, standing alone, is entitled to little weight in determining causation."

<u>Id.</u> at 898-99 (internal citations omitted). Further, the plaintiff failed to establish a temporal proximity between exercise-induced asthma and freon inhalation. As a result, the Eighth Circuit affirmed the district court's exclusion of causation testimony.

### A.     PEDRO G. MENDOZA, M.D.

Dr. Pedro G. Mendoza has been retained by Karen Anderson to testify in accordance with the information contained in her medical records. Dr. Mendoza is a treating physician specializing in pulmonary medicine. Anderson was seen by Dr. Mendoza on July 7, 2006, July 28, 2006, December 19, 2006, and April 23, 2007. Dr. Mendoza diagnosed Anderson with RADS resulting from hydrogen sulfide exposure.

Hess Corporation seeks to exclude any causation testimony by Dr. Mendoza, contending that Dr. Mendoza failed to make a differential diagnosis in determining that Anderson was exposed to hydrogen sulfide on June 20, 2006, and that this exposure caused her to develop RADS. Hess Corporation relies on the actual language of the medical records and the medical tests performed on Anderson in determining that Dr. Mendoza failed to make a differential diagnosis. However, Hess Corporation never deposed Dr. Mendoza.

"In performing a differential diagnosis, a physician begins by 'ruling in' all scientifically plausible causes of the plaintiff's injury. The physician then 'rules out' the least plausible causes of injury until the most likely cause remains. The final result of a differential diagnosis is the expert's conclusion that a defendant's product caused (or did not cause) the plaintiff's injury." Glastetter v. Novartis Pharmaceuticals Corp., 252 F.3d 986, 989 (8th Cir. 2001). In a factually similar case, the Eighth Circuit has found causation testimony admissible when the treating physician ruled out other possible causes of the victim's illness, concluded that the victim developed the medical condition as a result of his exposure to a specific toxic fume, and relied on published studies linking the medical condition to the toxic fume. See Mattis, 295 F.3d at 861. In other words, essential to the admission of causation testimony in toxic tort cases is that the medical expert has

11

performed a reliable differential diagnosis by ruling out other possible causes of the victim's condition.

The Court finds the evidence insufficient to determine whether Dr. Mendoza made a proper differential diagnosis in determining that Karen Anderson was exposed to hydrogen sulfide on June 20, 2006, and that this exposure caused her to develop RADS. Anderson has failed to provide evidence of the methodology which Dr. Mendoza used to determine the cause of Anderson's symptoms and, as a result, the Court is unable to determine whether Dr. Mendoza's methodology is sufficiently reliable under Rule 702 and Daubert. Dr. Mendoza was never deposed in this case. Further, the record is insufficient to determine whether Dr. Mendoza considered other possible causes and excluded each possible cause until only one remained. Accordingly, the Court will defer ruling on the admission of Dr. Mendoza's testimony on causation until trial, and only after an evidentiary hearing is held outside the presence of the jury to determine whether Dr. Mendoza made a differential diagnosis.

Counsel for the Plaintiff indicated at oral argument that Dr. Mendoza will likely not testify at trial.

### B.     NICHOLAS H. NEUMANN, M.D.

Dr. Nicholas H. Neumann has been retained by Anderson to testify in accordance with the information contained in the medical records. Dr. Neumann is a licensed physician in North Dakota specializing in lung diseases and disorders. Dr. Neumann provided medical care to Anderson on September 4, 2007, December 4, 2007, June 24, 2007, and December 16, 2008.

On December 3, 2007, the Court filed a Scheduling/Discovery Plan in this action.  See Docket No. 6.  Pursuant to that scheduling plan, Karen Anderson was required to serve disclosures regarding the names of her expert witnesses and complete reports by August 1, 2008.  However, the scheduling plan required that "[t]reating physicians need not prepare reports, only qualifications, unless they will express opinions not reflected in the medical records."  See Docket No. 6.  Anderson has filed an "Affidavit of Nicholas H. Neumann, M.D." to reveal Dr. Neumann's methodology in diagnosing her with RADS secondary to hydrogen sulfide exposure.  Hess Corporation argues that the Court should disregard the "Affidavit of Nicholas H. Neumann, M.D." because it contains information, such as the methodology of Dr. Neumann's opinions, which is not included in Anderson's medical records.  In other words, Hess Corporation is arguing that the affidavit includes information which should have been served in a report on or before August 1, 2008, and, therefore, the affidavit is untimely.

The Court is unpersuaded by Hess Corporation's argument.  Dr. Neumann's opinions as to Anderson's condition and the cause of her condition are clearly reflected in the medical records.  Dr. Neumann was not required to file a report to testify in accordance with his opinions and the methodology behind those opinions.  Accordingly, the Court finds that the "Affidavit of Nicholas H. Neumann, M.D." is timely.

In the "Affidavit of Nicholas H. Neumann, M.D.," Dr. Neumann states that he first saw Karen Anderson on September 4, 2007, to diagnose and treat her for any respiratory disorders.  Prior to the September 4, 2007, appointment, Dr. Neumann indicates that he reviewed Dr. Mendoza's and Dr. R. Michael Bowen's records.  On September 4, 2007, Dr. Neumann performed an extensive medical history in which he ruled out other possible causes for her condition:

> Mrs. Anderson had no prior history of asthma or respiratory symptoms. Further, there was no family history of asthma. Mrs. Anderson had been exposed to second hand smoke (her father smoked) as a child, but Mrs. Anderson had no history of smoking. Mrs. Anderson could recall no event, other than the exposure to gas on June 20, 2006, which had brought on her symptoms. Her work experience for the last many years had been that of working in an insurance agency. She had no military service and no significant travel history which would suggest exposure to a chemical irritant at some other location. I learned of no other significant exposure to a gas, smoke, fume, or vapor with irritant qualities in high concentrations that could have caused her condition other than the June 20, 2006 event.

See Docket No. 21.

Dr. Neumann performed a pulmonary function test and a methacholine challenge test which confirmed asthma. Dr. Neumann diagnosed Anderson with RADS secondary to hydrogen sulfide exposure on June 20, 2006. Dr. Neuman stated, "A RADS diagnosis is based on an absence of previous respiratory complaints, the onset of symptoms after a single specific exposure, an exposure to gas, smoke, fume, or vapor with irritant qualities in high enough concentrations to cause harm, an onset of symptoms within 24 hours that persists for at least three months, symptoms that simulate asthma, and a positive methacholine challenge. In addition, other types of pulmonary diseases should be ruled out." See Docket No. 21.

Dr. Neumann considered whether Anderson's symptoms were indicative of suffering from a panic attack on June 20, 2006. "Although Mrs. Anderson may have experienced anxiety at times prior to June 20, 2006, there is no good basis for concluding that she was suffering a panic attack on June 20, 2006, and the medical records from the Tioga Medical Center do not support that conclusion." See Docket No. 21. Dr. Neumann further stated, "a panic attack cannot explain the positive methacholine challenge results on September 1, 2006 and September 4, 2007. Those test results are consistent with RADS and not associated with a panic attack." See Docket No. 21.

Further, Dr. Neumann ruled out Canadian fires and/or farm chemicals as the cause of her June 20, 2006, symptoms. Dr. Neumann stated, "I am unaware of any smoke conditions from Canadian fires in 2006 which caused RADS to residents of northwestern North Dakota or of any exposure that Mrs. Anderson had to farm chemicals which caused her condition. Rather, there is a strong temporal connection between the release of gases from the Hess facility on the early morning hours of June 20, 2006, the strong smell of $H_2S$ and $SO_2$ reported by Mr. Anderson in the bedroom in which she was sleeping, and the immediate symptoms that Mrs. Anderson developed at approximately 4:30 a.m. on the morning of June 20, 2006." See Docket No. 21.

The evidence shows that Dr. Neumann ruled out other possible causes of Anderson's symptoms and that his medical opinion as to causation is based on a reasonable degree of medical certainty. In determining the cause of Anderson's symptoms, Dr. Neumann considered the temporal proximity between Anderson's alleged exposure and symptoms, the strong presence of $H_2S$ and $SO_2$ in her bedroom, the acknowledgment by Hess Corporation that gases escaped from the Silurian Battery on June 20, 2006, and the highly toxic nature of $H_2S$ and $SO_2$. In addition, Dr. Neumann considered that the onset of Anderson's symptoms occurred within 24 hours of the alleged exposure to $H_2S$ and $SO_2$, her symptoms simulated asthma, and there is a known absence of other fumes with irritant qualities similar to $H_2S$ and $SO_2$. Accordingly, the Court finds that Dr. Neumann's differential diagnosis of Karen Anderson was for the purpose of identifying not only Anderson's condition, but also the cause of that condition. The Court further finds that Dr. Neumann's medical opinion as to causation is based upon a proper differential diagnosis and, therefore, is sufficiently reliable to satisfy Daubert. As a result, causation testimony by Dr. Neumann will be admissible at trial.

### C. <u>GAIL JOYCE, PA-C</u>

Gail Joyce has been retained by the Plaintiff to testify in accordance with the information contained in Karen Anderson's medical records. Gail Joyce is a physician's assistant.

The Court finds that the record is devoid of any evidence that Gail Joyce performed a differential diagnosis. The record is devoid of any information as to Joyce's expert medical opinion concerning the cause of Anderson's symptoms occurring on or after June 20, 2006, <u>or</u> that she is qualified to render an opinion on causation. Assuming that Gail Joyce has an expert opinion as to the underlying cause of Anderson's symptoms, there is no evidence that her opinion would be based on a reasonable degree of medical certainty or that she ruled out other possible causes for Anderson's condition. Therefore, the Court finds that testimony from Gail Joyce concerning general or specific causation is not sufficiently reliable to satisfy <u>Daubert</u>. Accordingly, causation testimony from Gail Joyce will not be admissible at trial.

### D. <u>CORINNE COUGHLIN, PA-C</u>

Corinne Coughlin has been retained to testify in accordance with the information contained in Karen Anderson's medical records. Corinne Coughlin is a physician's assistant.

The Court finds that the record is devoid of any evidence that Corinne Coughlin performed a differential diagnosis. The record is devoid of any information as to Corinne Coughlin's expert medical opinion concerning the cause of Anderson's symptoms occurring on or after June 20, 2006, <u>or</u> that she is qualified to render an opinion on causation. Assuming that Corinne Coughlin has a medical expert opinion as to the cause of Anderson's symptoms, there is no evidence that her opinion would be based on a reasonable degree of medical certainty or that she ruled out other

16

possible causes for Anderson's condition. Therefore, the Court finds that medical testimony from Corinne Coughlin concerning general or specific causation is not sufficiently reliable to satisfy Daubert. Accordingly, causation testimony from Corinne Coughlin will not be admissible at trial.

### E. TONYA ANDERSON, FNP-C

Tonya Anderson has also been retained to testify in accordance with the information contained in Karen Anderson's medical records. Tonya Anderson is a treating mental health professional.

The Court finds that the record is devoid of any evidence that Tonya Anderson performed a differential diagnosis of Anderson. The record is devoid of any information as to Tonya Anderson's expert medical opinion concerning the cause of Anderson's symptoms occurring on or after June 20, 2006, or that she is qualified to render an opinion on causation. Assuming that Tonya Anderson has a medical expert opinion as to the cause of Anderson's symptoms, there is no evidence that her opinion would be based on a reasonable degree of medical certainty or that she ruled out other possible causes for Anderson's condition. Therefore, the Court finds that medical testimony from Tonya Anderson concerning general or specific causation is not sufficiently reliable to satisfy Daubert. Accordingly, causation testimony from Tonya Anderson will not be admissible at trial.

**IV.     CONCLUSION**

The Court **DENIES** the Defendant's Motion in Limine (Docket No. 11) as to Dr. Nicholas H. Neumann.  The Court finds that Dr. Neumann is a qualified medical specialist whose causation opinion is relevant, would assist the finder of fact, and is based on methodology sufficiently reliable to satisfy Daubert.  The Court **GRANTS** the Defendant's Motion in Limine (Docket No. 11) as to any opinions on causation to be elicited from Gail Joyce, Corinne Coughlin, and Tonya Anderson for the reasons set forth above.   The Court will defer ruling on the Defendant's Motion in Limine (Docket No. 11) as to Dr. Pedro G. Mendoza.  Dr. Mendoza is certainly qualified to render an opinion on causation which would be of assistance to the jury but the record does not adequately reveal the basis for his opinion or the methodology employed.

In addition, the Court **DENIES** the Defendant's Motion for Summary Judgment (Docket No. 14).  The Court has determined that Dr. Neumann may testify as to causation and, therefore, a factual dispute exists as to the cause of Karen Anderson's symptoms occurring on or after June 20, 2006.

**IT IS SO ORDERED**.

Dated this 12th day of January, 2009.

*/s/  Daniel L. Hovland*
Daniel L. Hovland, Chief Judge
United States District Court